UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

QUIANA A. COLEMAN,           )
                             )
              Plaintiff      )
                             )
        v.                   )    Case No. 2:07 cv 394
                             )
MICHAEL J. ASTRUE,           )
Commissioner of Social Security )
                             )
              Defendant      )

OPINION AND ORDER

This matter is before the court on the petition for judicial
review of the decision of the Commissioner of Social Security
filed by the plaintiff, Quiana A. Coleman, on November 6, 2007.
For the reasons set forth below, the decision of the Commissioner
is **AFFIRMED.**

Background

The plaintiff, Quiana A. Coleman, applied for Supplemental
Security Income ("SSI") on December 6, 2004, alleging a disabil-
ity onset date of February 2, 2003, due to memory impairment and
low back pain with a history of a cervical spine fracture and
fusion.[1] (Tr. 20)  Coleman's claim was denied on March 23, 2005,
and upon reconsideration on May 23, 2005.  (Tr. 20)  Coleman

---

[1]Coleman previously had applied for SSI on April 5, 2003.  (Tr. 70-71)
Her claim initially was denied on August 11, 2003, and upon reconsideration on
February 9, 2004.  (Tr. 20)  The SSI application considered herein was that
filed by Coleman after she failed to pursue her previous SSI application in a
timely manner.  (Tr. 20)  It is noted that the sole issue is whether the
claimant was disabled when she filed the current application for benefits on
December 6, 2004, and the denial properly shall remain unreviewed.  Coleman's
complete medical history, however, was included in the record and considered
by the ALJ.  (Tr. 20)

requested a hearing before an Administrative Law Judge, and a hearing before ALJ Denise McDuffie Martin was held on November 17, 2005. Coleman, her grandmother, Dorothy Metcalf, and vocational expert James Breen testified at the hearing. (Tr. 318) During the hearing, the ALJ ordered additional orthopedic and psychological examinations of Coleman which were accomplished in February 2006. (Tr. 248-257, 258-267) On August 24, 2006, the ALJ found Coleman not disabled. (Tr. 21) Following a denial of her request for review by the Appeals Council on March 22, 2007, and an extension of time granted by the Appeals Council, Coleman filed a complaint in this court on November 6, 2007. (Tr. 6, 9; DE 1)

Quiana Coleman was born on April 1, 1980, making her 25 years old at the time of the hearing before the ALJ. (Tr. 26) She attended school through the 11th grade and did not attend special education classes. (Tr. 141) Her work history included a part-time position packing candy in boxes and full-time positions cleaning and changing linens as a hotel housekeeper from 2000 to 2002. (Tr. 138, 326-27) She stopped working in August 2002 because of a pregnancy. (Tr. 138) Her four children were ages 11, 6, 4, and 3, at the time of the hearing. (Tr. 324)

Coleman sustained an injury in a motor vehicle accident on February 2, 2003. (Tr. 148) She was in a comatose state for 12 days following the trauma, regaining responsiveness on February 13, 2003. (Tr. 148) She also sustained fractures of the fourth and fifth metacarpal bones in her left hand and perhaps her left

pinky finger.[2]  (Tr. 148, 284)  Though the injuries sustained in the accident were severe, the record consistently reveals the expectancy of a complete recovery.  (*See, e.g.,* Tr. 146, 284) *See also* Tr. 171-72 (noting that claimant should "expect full recovery with no functional impairments" of left hand use if compliant with treatment.).  Although immediately subsequent to her injuries Coleman relied on prescription painkillers, by 2005 she required only over-the-counter pain relievers such as Tylenol, Motrin, or other forms of Ibuprofen.  (Tr. 23, 216)

Coleman related in an interview with a Social Security Administration representative that she was able to live on her own and do the grocery shopping, cooking, cleaning, and laundry for her family.  (Tr. 130)  She is right-handed.  (Tr. 324)  She reported spending much of her time watching television - videos, talk shows, and cartoons with the kids.  (Tr. 131)  Coleman cannot drive, but this is unrelated to her injuries and stems from never learning basic driving skills.  (Tr. 143)  Her responses to questions about her abilities and goals of reentering the workforce were inconsistent, sometimes projecting the hope of employment, while at other times examiners noted her lackluster effort at regaining the ability to work.  *Compare* Tr. 245 (stating that claimant "wants to return to work since she is bored

_____

[2] Coleman's discharge summary lists only the fractured metacarpal bones in the hand with no mention of a broken finger.  The later document, a letter from Ralph W. Richter, Jr., M.D., states  that "it is unclear if the patient fractured her left little finger at the time of the auto accident" and describes "an old fracture in the left little finger metacarpal base."  (Tr. 284)  The letter continues, "[t]he patient claims that since the summer of 2005 she has been unable to use her left hand because of this injury."  (Tr. 284)  There is no explanation given for the 2005 onset of problems.

just sitting at home doing nothing") *with* Tr. 260 (noting claim-
ant's refusal to attempt a grip test with her left hand and
giving inconsistent attempts during examination).

From 2003 to the time of the hearing in 2005, Coleman showed
consistent improvement in both her physical and mental capabili-
ties.  This is displayed by the three Psychological Evaluations
conducted by Shashi Anand, PhD.  On June 30, 2003, Dr. Anand
first evaluated a medication-free Coleman, assessing a GAF of 58
(indicating moderate symptoms or a moderate impairment in social,
occupational, or school functioning) but noting that she was
"guarded" and "may start off with giving correct response and
then taper off when she would become conscious that she was doing
well and regress."  (Tr. 164-171, 170)  On January 17, 2005, Dr.
Anand evaluated Coleman a second time, assessing a GAF of 75
(indicating that if symptoms were present, they were transient
and expected reactions to psycho-social stressors, and there was
no more than a slight impairment in social, occupational, or
school functioning) and noting that her memory for both recent
and remote events, her abstract thinking, conceptual thinking,
judgment, attention, and concentration were all intact.[3]  (Tr.
215)  On February 4, 2006, Dr. Anand evaluated Coleman for a
third time, assessing a GAF of 70 (the high-end score indicating
some mild symptoms or difficulty in social, occupational, or
school functioning, but generally functioning pretty well) and

---

[3]These findings were confirmed by Richard Hamersma, PhD, on March 22,
2005, when he also found a GAF of 75 and no severe impairments on Coleman's
mental (or physical) abilities.  (Tr. 245-46)

noting no impairments in understanding, remembering, carrying out instructions, and responding appropriately to situations in a work setting. (Tr. 255-56)

Likewise, the physical evaluations of Coleman revealed progress over the same time period. Though it is reported that she was taking pain pills for a short time following the accident, the record does not indicate consistent or long-term usage of prescription medicines for pain relief. (Tr. 129) Rather, the record indicates that Coleman's occasional headaches and her lower back or neck pain were relieved with Tylenol. (Tr. 216-17) Several exams revealed that her left hand unquestionably had a weaker grip than her right hand. (Tr. 161-62, 221, 264) By 2006, however, her examiners concluded that her left hand manipulation skills were not impaired and that any hand problems were completely resolvable with occupational therapy. (Tr. 266, 284)

At the hearing before ALJ Martin, Coleman testified that she suffered from back problems which required her to sit and rest if she stood or walked for too long of a time. (Tr. 327-28) She estimated the back pain rated as nine on a scale to ten. (Tr. 328) Next, she asserted that her neck was weak and also gave her constant pain. (Tr. 329) Additionally, Coleman stated that her left hand was weak and when she attempted to lift things with it, she experienced problems that spread to her back. (Tr. 330, 339-40) She testified that she was unable to cook regularly for herself and unable to perform basic household chores, though she could wash clothes for herself and her children. (Tr. 331-333)

Coleman explained her dependance on volunteer drivers to transport her for shopping and church services, stating that the available public transportation seats bothered her back.  (Tr. 334-35)  She described difficulty in personal hygiene, explaining her reliance on a stool to sit on in the shower.  (Tr. 335-36)  Coleman stated that she could not walk four blocks or stand for longer than ten minutes without sitting and resting.  (Tr. 337)  When asked about her ability to care for her children, she stated, "I'm not able to take care of them."  (Tr. 341)

The ALJ questioned Coleman about memory loss, and Coleman stated that she suffered from both short-term and long-term memory loss.  (Tr. 343)  However, she denied suffering from headaches.  (Tr. 345)  Coleman told the ALJ that she did not attend her children's school functions because she feared not understanding any information she might receive there.  (Tr. 348-49)  Coleman stated that she got along well with other people, but that her attention and concentration were lacking at times.  (Tr. 349)

Metcalf, Coleman's grandmother, testified that she helped the claimant by providing home-cooked meals up to two times each week and helped with household work on occasion.  (Tr. 345-347)  Metcalf corroborated Coleman's testimony that her memory was problematic, stating that it "still ain't good like it's possibly like it's supposed to be" and that she reminded her of medical appointments.  (Tr. 347)

Because Coleman's treating physician, Dr. Arvind K. Kakod-kar, had recommended that she be seen by an orthopedic surgeon and a neurologist, yet Coleman never had seen either specialist, the ALJ ordered a consultative examination by an orthopedic doctor and a neuropsychological examination to address the memory loss. (Tr. 350-51)  Additionally, Coleman was to receive further tests, an MRI and a CAT scan, which were added to the record for review by the ALJ before she made a determination.  (Tr. 344, 351)

The vocational expert, James Breen, asked Coleman a few questions about her work history and then classified that work history for the ALJ as unskilled in the light working category of the Dictionary of Occupational Titles ("DOT").  (Tr. 354)  The ALJ posed a hypothetical question that assumed Coleman's age, education, and past work experience, a limitation of light work with occasional climbing, stooping, kneeling, crouching, and crawling, and simple, low-stress, routine, repetitive-type jobs.  (Tr. 354)  Breen testified that such a hypothetical person could perform the past work that Coleman had done before.  (Tr. 354)  With the additional limitation to the hypothetical question of only occasional gripping and grasping, Breen said that candy packing would be excluded, but housekeeping still would be a viable option.  (Tr. 354-55)  When the ALJ further reduced the hypothetical from light work to sedentary work with all the previous limitations, Breen said that such a worker would not be able to return to any of Coleman's prior work positions, but that

7

there were thousands of unskilled, sedentary clerk positions in the Chicago and Northwestern Indiana area. (Tr. 355) Unskilled sedentary clerk positions available numbered 5500, while unskilled sedentary food and beverage order clerk positions numbered about 32,000. (Tr. 355) Breen confirmed that these jobs were consistent with those found in the DOT. (Tr. 355)

In her decision, the ALJ found Coleman had not engaged in substantial gainful activity since February 2, 2003, the date of the car accident, and that she had the following severe impairments: low back pain with a history of a cervical spine fracture and fusion and a mild memory impairment. (Tr. 22) However, the ALJ found that Coleman's impairments did not meet or medically equal the criteria of any of the listed impairments. (Tr. 22-23)

The ALJ continued:

> After careful consideration of the entire record, I find that the claimant, since December 6, 2004, [the date of her SSI application,] has had the residual functional capacity to perform light work, which would include the ability to lift/carry 10 pounds frequently and 20 pounds occasionally, to stand and/or walk six hours out of an eight-hour day, and to sit six hours out of an eight hour day; subject to no climbing of ladders, ropes or scaffolds and no more than occasional climbing of ramps/stairs, balancing, stooping, kneeling, crouching, crawling, gripping and grasping. I further find that the claimant has the mental residual functional capacity to perform simple, repetitive and routine tasks.

> (Tr. 23)

Expounding on these findings, the ALJ went into great detail

describing Coleman's symptoms and testimony, the medical evidence of record before the hearing, that submitted subsequent to the hearing, and the evidence contained in the post-hearing orthopedic and psychological exams. (Tr. 23-26) The ALJ meticulously discussed the psychological evaluations and those findings, the X-rays, MRIs, and other medical evidence relating to Coleman's neck, back, and left hand, and the findings resulting from the sum of that evidence. She discussed Coleman's cervical motion, left upper extremity strength and range of motion, grip strength, dexterity, and the absence of any finding of memory problems, and she referred to exhibits throughout the decision with painstaking accuracy. (Tr. 25) Likewise, the ALJ discussed Coleman's psychological state, citing exhibits in the record starting with the State agency medical consultants' finding of no severe mental impairments before the hearing, through the post-hearing psychological examination by Dr. Anand that resulted in a similar conclusion. (Tr. 24-25)

Acknowledging the significant limitations of Coleman in the months immediately following the motor vehicle accident, the ALJ did not find convincing Coleman's allegations of constant great pain and inability to perform any light work. (Tr. 25) The ALJ referred specifically to exhibits in the record denoting the medications that Coleman was taking for pain - or the lack thereof - and the repeated positive prognosis given by her treating physicians. (Tr. 25) Though the ALJ noted that Coleman's chiropractor, in an unsigned post-hearing report, asserted

significant left hand limitations, she found the post-hearing assessment by the orthopedic physician, Dr. Phillip S. Budzenski, more consistent with the conclusions that she had reached from the pre-hearing record and her impressions from the hearing. (Tr. 26)  Though Dr. Anand assessed no mental limitations on Coleman's ability to work, the ALJ gave her "the benefit of the doubt giving [sic] her history of a head injury" and found her limited to simple, repetitive, and routine work.  (Tr. 26)  In this finding, the ALJ specifically cited Exhibit 17F, which included the B criteria ratings of Coleman's functional limitations resulting from her mental status.  Those ratings relate to restriction of activities of daily living, maintenance of social functioning, maintenance of concentration, persistence, or pace, and any episodes of decompensation.  (Tr. 24)

Finding Coleman unable to perform her past relevant work, the ALJ considered her age, education, unskilled work history, and the residual functional capacity to conclude that Coleman was able to perform the requirements of jobs such as an information clerk, charge account clerk, and a food and beverage order clerk, which existed in substantial numbers in the local economy.  (Tr. 27) The ALJ found the vocational expert's testimony on job availability consistent with the information in the Dictionary of Occupational Titles.  (Tr. 27)  Thus, Coleman was found not to have been under a "disability" since the date her application was filed.  (Tr. 27)

## Discussion

10

The standard for judicial review of an ALJ's finding that a claimant is not disabled within the meaning of the Social Security Act is limited to a determination of whether those findings are supported by substantial evidence. 42 U.S.C. §405(g) ("The findings of the Commissioner of Social Security, as to any fact, if supported by substantial evidence, shall be conclusive."); *Schmidt v. Barnhart*, 395 F.3d 737, 744 (7th Cir. 2005); *Lopez ex rel Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence has been defined as "such relevant evidence as a reasonable mind might accept to support such a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 1427, 28 L.Ed.2d 852, (1972)(*quoting Consolidated Edison Company v. NRLB*, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed.2d 140 (1938)). *See also Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003); *Sims v. Barnhart*, 309 F.3d 424, 428 (7th Cir. 2002). An ALJ's decision must be affirmed if the findings are supported by substantial evidence and if there have been no errors of law. *Rice v. Barnhart*, 384 F.3d 363, 368-69 (7th Cir. 2004); *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002). However, "the decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues." *Lopez*, 336 F.3d at 539.

Supplemental insurance benefits are available only to those individuals who can establish "disability" under the terms of the Social Security Act. The claimant must show that she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). The Social Security regulations enumerate the five-step sequential evaluation to be followed when determining whether a claimant has met the burden of establishing disability. 20 C.F.R. §416.920. The ALJ first considers whether the claimant is presently employed or "engaged in substantial gainful activity." 20 C.F.R. §416.920(b). If she is, the claimant is not disabled and the evaluation process is over; if she is not, the ALJ next addresses whether the claimant has a severe impairment or combination of impairments which "significantly limits . . . physical or mental ability to do basic work activities." 20 C.F.R. §416.920(c). Third, the ALJ determines whether that severe impairment meets any of the impairments listed in the regulations. 20 C.F.R. §401, pt. 404, subpt. P, app. 1. If it does, then the impairment is acknowledged by the Commissioner to be conclusively disabling. However, if the impairment does not so limit the claimant's remaining capabilities, the ALJ reviews the claimant's "residual functional capacity" and the physical and mental demands of her past work. If, at this fourth step, the claimant can perform her past relevant work, she will be found not disabled. 20 C.F.R. §416.920(e). However, if the claimant shows that her impairment is so severe that she is unable to engage in her past relevant work, then the burden of proof shifts to the Commissioner to establish that the claimant, in light of her age, education, job

experience, and functional capacity to work, is capable of performing other work and that such work exists in the national economy.  42 U.S.C. §423(d)(2); 20 C.F.R. §416.920(f).

Coleman propounds four reasons for reversing or remanding the ALJ's decision: first, that the ALJ failed to incorporate all of Coleman's limitations into her mental residual functional capacity ("MRFC"); second, that the ALJ failed to incorporate Coleman's neck pain and immobility into her RFC; third, that the ALJ made an improper credibility finding that lacked reliance on objective evidence; and fourth, that the ALJ erred in step five by posing incomplete hypotheticals to the vocational expert and relying on the unsupported testimony of the vocational expert.

To begin, Coleman argues that the ALJ impermissibly concluded that Coleman could perform simple, repetitive, and routing tasks but failed to use the "special technique" necessary for a function-by-function assessment.  This technique, designated by §404.1520a(e), requires specific findings for each of four criteria: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; (4) episodes of decompensation.  *See David v. Barnhart*, 446 F.Supp.2d 860, 876 (N.D. Ill. 2006) (describing the special technique).  The Commissioner counters that such a failure is harmless error if the outcome after application of the special technique would be the same.

First, though Coleman directs the court to *Craft v. Astrue*, 539 F.3d 668 (7th Cir. 2008) as an example of the Seventh Circuit reversing and remanding for the failure to use the special

technique, that case is clearly distinguishable.[4]  In *Craft*, the
court specified that the error was not harmless specifically
because the ALJ's failure to apply the special technique "was
compounded by a failure of analysis during the mental RFC deter-
mination[.]"  539 F.3d at 675.  In *Craft,* the ALJ failed to take
any mental limitations into account in the RFC and the hypotheti-
cal posed.  539 F.3d at 677.  Unlike *Craft*, the ALJ here dis-
cussed with Coleman at the hearing her daily chores and activi-
ties (i.e., her activities of daily living), her family, friends,
children's school, and church activities (i.e., her social
functioning), her long-term and short-term memory, and her
"attention and concentration."  A review of the ALJ's questioning
of Coleman at the hearing reveals a step-by-step walk through the
B criteria, and the written decision incorporates Coleman's
responses as well as specifically citing supporting record
evidence.  *Cf. Lechner v. Barnhart*, 321 F.Supp.2d 1015, 1036
(E.D. Wis. 2004)(finding ALJ failed to assess claimant's mental
abilities on a function-by-function basis and offered no explana-
tion for and cited no medical evidence supporting her RFC assess-
ment).

---

[4]The court notes that counsel for Coleman also was counsel to the claim-
ant in *Craft*.  A cursory search of Seventh Circuit federal courts reveals that
counsel here raises the special technique quite regularly.  *See, e.g. Schmidt
v. Astrue*, 496 F.3d 833 (7th Cir. 2007)(affirming ALJ decision denying bene-
fits and finding that ALJ adequately evaluated B criteria); *Bradley v. Barn-
hart*, 175 Fed.Appx. 87, 2006 WL 895868 (7th Cir. April 7, 2006) (affirming
ALJ decision denying benefits and finding that contrary to claimant's assertions,
the ALJ addressed the four categories of functional limitations of the B
criteria); *David,* 446 F.Supp.2d at 860 (affirming ALJ's denial of benefits and
finding that special technique satisfied by explicit reliance on Psychiatric
Review Technique ("PRT") and mental RFC determination).  It must be noted that
the PRT form includes the form for rating the B criteria.

Second, pursuant to Federal Regulations, the "special technique" to rating the degree of mental functioning is only intended to aid an adjudicator in assessing the level of severity of a claimant's mental impairment at Steps Two and Three of the Five-Step sequential evaluation. 20 C.F.R. §404.1520a(c)(3) (*citing* 20 C.F.R. Pt. 404, Subpt. P., App. 1, §12.00(C)).

In the instant case, the ALJ conducted a proper Step Three analysis when she explicitly determined that Coleman's mental impairments were not of listing level severity. Specifically, the ALJ found that Coleman suffered from "mild memory impairment." (Tr. 22) This impairment did not equate with listing level severity under the Listing of Impairments. 20 C.F.R. Pt. 404, Subpt. P., App. 1. Thus, because Coleman's limitations were found to fall short of listing level, the special technique of rating a claimant's degree of mental functioning was not warranted and the failure to perform the technique did not result in an incomplete record.

In addition, the ALJ's decision plainly referred to exhibits within the record where analysis of the B criteria, or special technique, were documented. Specifically, upon finding Coleman did not have an impairment that met or equaled the criteria of any in the Listing of Impairments, the ALJ cited Exhibit 17F, which rated her limitations in the four B criteria as "Mild" or "None." (*See* Tr. at 23, 238) Such a reference demonstrates that although the ALJ's decision did not elaborate upon the B criteria, the ALJ did indeed incorporate the special technique when

finding that Coleman did not have a severe mental impairment.[5]
*See **David***, 446 F.Supp.2d at 877 ("Though the ALJ did not specifi-
cally mention the special technique, she explicitly relied upon
Exhibit 13F, i.e., a Psychiatric Review Technique . . . , and the
mental RFC determination made by the ME at the hearing.").  In
short, there was no error.[6]

Coleman also alleges that the ALJ gave non-examining state
physicians controlling weight.  That allegation is completely
accurate.  However, as the ALJ plainly and accurately stated,
"[N]o treating source has provided a detailed assessment of the
claimant's physical or mental abilities or limitations."  (Tr.
26)  This boilerplate argument fails because no treating physi-
cian's opinion was disregarded in favor of a state physician's
opinion.

Coleman contends that the ALJ erred because Dr. Kakodkar had
recommended a *neuro*psychological examination, which was discussed
at the hearing, but she failed to order such an exam.  Instead,
at the ALJ's direction, Coleman was given another psychological
examination.  The ALJ's promise in the hearing to "get something
as close as possible" to a neuropsychiatric exam was not broken.

---

[5]Exhibit 9F includes another B criteria rating of Coleman.  Exhibit 20F
includes reference to a PRTF indicating Coleman's mental impairments were not
severe.  Exhibit 21F is another B criteria review.  The ALJ's decision cited
each of these exhibits plus several others in her determination that Coleman
did not have an impairment or combination of impairments that met or medically
equaled one of those listed.

[6]In the event there was error, the Commissioner is correct in labeling
it harmless.  The record contains at least four B criteria assessments, all of
which find Coleman with mild or no limitations in those areas of mental
functioning.  (*See* Ex. 9F, 17F, 20F, 21F).

Given that Coleman performed adequately on that subsequent memory evaluation, which was consistent with tests conducted prior to the hearing, the ALJ fulfilled her duty to investigate the facts and develop the arguments both for and against granting bene-fits.[7] *See Sims v. Apfel*, 530 U.S. 103, 110-22, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000)(explaining that duty).

Coleman asserts that the ALJ failed to incorporate all of her limitations, specifically her neck pain and inability to turn her head, in her RFC as required by SSR 96-8p. SSR 96-8p ex-plains how an ALJ should assess a claimant's RFC at steps four and five of the sequential evaluation. In a section entitled "Narrative Discussion Requirements," SSR 96-8p specifically spells out what is needed in the ALJ's RFC analysis. This section of the Ruling provides:

> The RFC assessment must include a narrative discussion describing how the evidence sup-ports each conclusion, citing specific medi-cal facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations). In assessing RFC, the adjudi-cator must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and con-tinuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule), and describe the maximum amount of each work-related activity the individual can perform based on the evidence available in the case

---

[7] Coleman's citation quoting the ALJ's requirement to probe "scrupulous-ly and conscientiously" into all relevant facts leaves out a critical detail. *See **Cannon v. Harris***, 651 F.2d 513, 519 (7th Cir. 1981)("*Especially where the claimant is unassisted by counsel*, the ALJ has a duty to scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts.") (*citing **Gold v. HEW***, 463 F.2d 38, 43 (4th Cir. 1972))(emphasis added)(internal quotes omitted).

> record. The adjudicator must also explain how
> any material inconsistencies or ambiguities
> in the evidence in the case record were con-
> sidered and resolved. (footnote omitted)

> SSR 96-8p

Thus, as explained in this section of the Ruling, there is a
difference between what the ALJ must contemplate and what she
must articulate in her written decision. *See Morphew v. Apfel*,
2000 WL 682661 *3 (S.D. Ind. Feb. 15, 2000) ("There is a distinc-
tion here [in SSR 96-8p] between what the ALJ must consider and
what the ALJ must articulate in the written opinion."); *Lawson v.
Apfel*, 2000 WL 683256, *2-4 (S.D. Ind. May 25, 2000) (ALJ who
restricted the claimant to medium work satisfied the requirements
of SSR 96-8p)("[SSR 96-8p] does not require an ALJ to discuss all
of a claimant's abilities on a function-by-function basis.
Rather, an ALJ must explain how the evidence supports his or her
conclusions about the claimant's limitations and must discuss the
claimant's ability to perform sustained work activities.").

The ALJ in this case did just that, and she properly ex-
plained any material inconsistencies in the evidence. The RFC
finding here plainly exceeded the mandates of SSR 96-8p. The
ALJ's decision discussed all of the medical evidence of record
regarding Coleman's neck pain. Initially, the decision mentioned
that only four months after the accident, Coleman had full range
of motion of her cervical spine. Later, the decision referred to
the evidence submitted by treating sources, including cervical
spine X-rays, MRIs, and the undated and unsigned reports from

Coleman's chiropractor, as well as the post-hearing examination results from Dr. Budzenski, the orthopedist. After reviewing this evidence, the ALJ discussed a limitation of cervical motion and explained how this evidence did not support Coleman's professed lack of ability to perform sustained work activities.

Coleman adds to her contentions that the ALJ made an improper credibility finding, notably, a lack of objective evidence considered and a failure to ask Coleman why she was not taking any prescription painkillers. This court will sustain the ALJ's credibility determination unless it is "patently wrong" and not supported by the record. *Schmidt*, 496 F.3d at 843; *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006) ("Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed."). The ALJ's "unique position to observe a witness" entitles her opinion to great deference. *Nelson v. Apfel*, 131 F.3d 1228, 1237 (7th Cir. 1997); *Allord v. Barnhart*, 455 F.3d 818, 821 (7th Cir. 2006). However, if the ALJ did not make explicit findings and did not explain them "in a way that affords meaningful review," the ALJ's credibility determination is not entitled to deference. *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). Further, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

The ALJ must determine a claimant's credibility only after considering all of the claimant's "symptoms, including pain, and the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." 20 C.F.R. §404.1529(a); *Arnold v. Barnhart*, 473 F.3d 816, 823 (7th Cir. 2007)("subjective complaints need not be accepted insofar as they clash with other, objective medical evidence in the record."); *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004). If the claimant's impairments reasonably could produce the symptoms of which the claimant is complaining, the ALJ must evaluate the intensity and persistence of the claimant's symptoms through consideration of the claimant's "medical history, the medical signs and laboratory findings, and statements from [the claimant, the claimant's] treating or examining physician or psychologist, or other persons about how [the claimant's] symptoms affect [the claimant]." 20 C.F.R. §404.1529(c); *Schmidt,* 395 F.3d at 746-47 ("These regulations and cases, taken together, require an ALJ to articulate specific reasons for discounting a claimant's testimony as being less than credible, and preclude an ALJ from merely ignoring the testimony or relying solely on a conflict between the objective medical evidence and the claimant's testimony as a basis for a negative credibility finding.").

Although a claimant's complaints of pain cannot be totally unsupported by the medical evidence, the ALJ may not make a credibility determination "solely on the basis of objective

medical evidence." SSR 96-7p, at *1. *See also **Indoranto v. Barnhart***, 374 F.3d 470, 474 (7th Cir. 2004); ***Carradine v. Barn-hart***, 360 F.3d 751, 754 (7th Cir. 2004) ("If pain is disabling, the fact that its source is purely psychological does not disentitle the applicant to benefits."). Rather, if the

> [c]laimant indicates that pain is a signifi-
> cant factor of his or her alleged inability
> to work, the ALJ must obtain detailed de-
> scriptions of the claimant's daily activities
> by directing specific inquiries about the
> pain and its effects to the claimant.  She
> must investigate all avenues presented that
> relate to pain, including claimant's prior
> work record, information and observations by
> treating physicians, examining physicians,
> and third parties.  Factors that must be
> considered include the nature and intensity
> of the claimant's pain, precipitation and
> aggravating factors, dosage and effectiveness
> of any pain medications, other treatment for
> relief of pain, functional restrictions, and
> the claimant's daily activities.  (internal
> citations omitted)
>
> ***Luna v. Shalala***, 22 F.3d 687, 691 (7th Cir.
> 1994)

*See also **Zurawski v. Halter***, 245 F.3d 881, 887-88 (7th Cir. 2001).

In addition, when the ALJ has discounted the claimant's description of pain because it is inconsistent with the objective medical evidence, she must make more than "a single, conclusory statement . . . .  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and

the reasons for that weight." SSR 96-7p, at *2. *See Zurawski*,
245 F.3d at 887; *Diaz v. Chater*, 55 F.3d 300, 307-08 (7th Cir.
1995) (finding that the ALJ must articulate, at some minimum
level, his analysis of the evidence). He must "build an accurate
and logical bridge from the evidence to [his] conclusion."
*Zurawski*, 245 F.3d at 887 (*quoting Clifford*, 227 F.3d at 872).
When the evidence conflicts regarding the extent of the claim-
ant's limitations, the ALJ may not simply rely on a physician's
statement that a claimant may return to work without examining
the evidence the ALJ has rejected. *See Zurawski*, 245 F.3d at 888
(*quoting Bauzo v. Bowen*, 803 F.2d 917, 923 (7th Cir. 1986))
("Both the evidence favoring the claimant as well as the evidence
favoring the claim's rejection must be *examined*, since review of
the substantiality of evidence takes into account whatever in the
record fairly detracts from its weight.") (emphasis in original).

   As previously discussed, the ALJ thoroughly considered Cole-
man's symptoms, including pain, and the extent to which such pain
reasonably could be consistent with the objective medical and
other evidence. Coleman's impairments could not reasonably pro-
duce the pain level to which she testified. The ALJ thoroughly
questioned Coleman to elicit testimony about her daily activi-
ties, prior work, the nature and intensity of the pain, and the
use of any medications. The decision unambiguously detailed the
specific reasons for the ALJ's finding on credibility and sup-
ported that finding with evidence in the record, as required.
Specifically referring to Coleman's testimony and reports from

22

treating physicians, the ALJ found Coleman credible to the extent
of the RFC assessment.

Finally, Coleman contests the ALJ's application of step five
of the decision, whereupon she found that the limitations of the
claimant would allow her to work a substantial number of jobs in
the local economy. Coleman again raises the issue of her neck
problems, which were not mentioned in the RFC given to the
vocational expert. The above discussion and determination that
the ALJ did not fail to include the neck problems into the RFC
makes further discussion of this point moot. Coleman also dis-
putes that she was able to perform any of the suggested clerk
jobs because all of those jobs required gripping. Once again,
the decision is thorough in its portrayal of Coleman's capabili-
ties and limitations, and the ALJ added the limitation of only
occasional gripping to the original hypothetical, excluding
packing-type jobs. There is no evidence in the record that
Coleman was completely unable to grip things. To the contrary,
there was ample evidence allowing for lifting limitations for her
left hand, and the ALJ plainly referred to them and incorporated
them into her RFC and the hypothetical with its subsequent limi-
tations posed to the vocational expert.

Coleman also disputes the vocational expert's job availabil-
ity, stating that he gave no "support" for such numbers. How-
ever, the ALJ asked the vocational expert if the jobs he identi-
fied were consistent with the DOT, and the vocational expert
indicated that they were. No issue of inconsistency was raised,

23

and therefore there was no reason for the ALJ to address any conflict between the DOT and its companion publication, the Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles.

The ALJ thoroughly considered and explained her findings and conclusions, detailing the evidentiary source of each finding and thoroughly explaining the path from these findings to her final conclusions.  The ALJ clearly relied upon and related in her decision the necessary substantial evidence.  In fact, nothing in the record supports the limitations claimed by Coleman.

_____

For the aforementioned reasons, pursuant to Sentence Four of 42 U.S.C. §405(g), the decision of the Commissioner is **AFFIRMED**. The Clerk is directed to close the case.

ENTERED this 12th day of March, 2009


                              s/ ANDREW P. RODOVICH
                              United States Magistrate Judge